17-30233 Samuel Rees, Your Honor. I'm appearing today on behalf of the appellants Tobitex and MRM Energy. I want to thank you for the opportunity you have allowed me of addressing you today. I just have a few brief points that I want to make in connection with this. I want to summarize them. The claims that the BP dealers, my clients, seek to assert involve damages to the BP brand that visited upon them at their stations. The BP dealers are captives of BP, with no right to rebrand their stations when BP destroys the brand. The claims primarily arise out of duties created by non-maritime motor fuel franchise agreements requiring BP to protect its brand for the benefit of its dealers. Insofar as tort claims are asserted, the BP dealers do not The acts that we complain about all occurred on dry land. Moreover, the acts primarily occurred after the explosion of the Deepwater Horizon, or long before that explosion, but were only that we would like to assert if given the opportunity to amend the complaint. The tortious conduct has no effect on maritime commerce and no relationship to traditional maritime activity. It's a sale of motor fuel. To say, as the court did, and I recognize the court was looking at more than just our complaint. The court was primarily concerned with the complaint that the plaintiff's steering committee did on a whole variety of parties. We were sort of lumped into that. To say that the BP dealers, to say that we, cannot assert a claim that could not possibly sound in that it would be futile to allow us an opportunity to amend, if that's erroneous, it requires reversal. And because that review by this court is a de novo review, my only question to this court is, would you, after considering the facts that I'm trying to advance to this court, consider in your mind whether or not it would be possible for the BP dealers to assert a complaint? You used the adjective tortious. You said the conduct was tortious. We've asserted two types of conduct, or we would like to assert two types of conduct. One is contractual related, related to the franchise agreements. Because the franchise agreements have the requirement, it's actually a reciprocal requirement, to protect the brand. All right, what did they do that was not part of the Deepwater Horizon that was not protecting the brand? Allow me to elaborate on that. What happened? The American public is very forgiving, and oil spills happen. But the American public, particularly the consuming public, do not like liars. So what happened here is following the Deepwater Horizon, what we had were corporate pronouncements from BP. And those corporate pronouncements attempted to minimize the oil spill that was occurring. And as it kept shifting and shifting and shifting, they were shown to have been lying about that in callous disregard. That's what the American public didn't like. The other point, which was really a critical time, and I believe it occurred in May of 2010, about a month later, Tony Hayward, the CEO of BP, makes a public pronouncement of saying, I want my life back. Boy, did that have an effect on the consuming public. Did that destroy the brand? Did that cause consumers not to go into the station? Heck, my own wife told me I was not allowed to buy gas at a BP station. Can I deal in this industry? BP's got plenty of places where it can sell its gas, but the dealers can only sell at their station. So, yes, virtually all of the acts upon which the brand got damaged. I mean, there was other damage that occurred to people in the Gulf Coast because of the BP oil spill and the explosion and personal injuries and things like that. That wasn't us. There wasn't an ounce of oil that rolled up on our station property. We weren't claiming that we were only denied gas by people who were trying to travel to the Gulf area, which they couldn't do or didn't want to do because of the... No, that's not our thing. Our claim is, consuming public has lots of choices. You can buy your gas at Chevron or Shell or BP or Mobil. But the consuming public in this situation made the decision, not when the oil spill happened, but weeks after, a few weeks after, when it became known that BP were a bunch of liars who were doing everything possible to try and save their precious well and disregard the environmental problems that they had created. Now, that caused other problems, but from my point of view, the consuming public, as soon as the consuming public recognized that BP was a bunch of liars, they said, well, we know how to show BP, we'll just stop buying their gas. And boy, did that have an effect on my client. It didn't really so much have an effect on the BP dealer who was located down in Venice, Louisiana. Those guys know that guy. No, the place where it had like an unbelievable impact is in San Francisco, California, miles away from the oil spill. Well, we'll teach those people. That's our claim. Our claim is a destruction of a brand. It's really a contract-based claim that has nothing to do with maritime. So is it fair to say then that the conduct you're complaining about wouldn't have occurred but for the spill? Because it sounds like what you're talking about is sort of the management of that crisis. There are lots of different ways that a corporation can destroy its reputation. But in this situation, it was because of their conduct after the spill, which resulted in the animosity of which we claim. Now, if you're saying had the spill never occurred, would the animosity have developed? Don't think so. I mean, lots of other oil companies continue to sell gasoline because they don't have oil spills. But it's not the oil spill that caused it because the reaction time was so much later. So if I understand, if all the conduct you're complaining about is essentially downstream resulting from the spill, what is your best case that we nevertheless attach maritime jurisdiction to the original conduct but not to the downstream conduct? You see what I'm saying? Are we allowed to split maritime jurisdiction in that way? I don't think you need to. But let me try and address your point directly. I mean, I think everyone agrees that the Tupac test that the Supreme Court announced in Gruber and this Court has continuously followed is our appropriate test. So the first issue we've got is are we dealing with a tort claim or a contract claim? If we're dealing with a contract claim, then we don't need to look at Gruber. We just have to look at the contract and see if the contract is a maritime contract and the maritime contract deals with ships. Our franchise motor fuel agreement is not a maritime contract. So the maritime contract claims ought to exist regardless. But now let's turn to the tort-based claims. On the tort-based claims, you have to look at whether the tort occurred on navigable waters or was caused by a vessel. As I said in the outset, we don't claim that a single negligent act which occurred aboard the deepwater horizon is the basis for our damages. Accidents happen. Negligence on oil rigs happen. That doesn't cause a complete destruction of the brand. So the location test says you must look at that. Now, for the people who suffered oil damage because oil spilled up on their property, they had a claim. In fact, they settled that claim. They have a claim that says the negligent act that occurred on that vessel by failing to stop the test and do the other stuff that we now know from history caused the rig to explode and the oil to pump. They have a claim, an admiralty claim. No question about that. Our claim is just entirely different because we don't focus on the act of some engineer who happened to have been on the deepwater horizon. We focus on the public pronouncements of BP occurring afterwards. That's the tortious act. That's why it's not splitting the admiralty claim. It's looking at the claims, the admiralty claims of people who have them versus the non-admiralty claims of people who have those. We have the non-admiralty claims. What's the difference, in your theory, between the people who you described as having oil wash up on their property and what BP did to try to remedy or minimize that and the corporate pronouncements after the fact that are trying to contain the reputation? Let me try and address that. The people who had oil spill up on their land, that oil was going to spill up on their land after the deepwater horizon exploded regardless of anything that was said in the corporate headquarters. No, but it could have been the corporate headquarters saying get out there with your mops and your absorption and keep that oil from getting to the land. Sure, and there's mitigation claims that could be brought in there and we did this and we did that. That deals with that admiralty claim. I mean if the consuming public had not become so angry at the statements that BP made, we wouldn't have suffered the same problem. Remember the Exxon Valdez case? The Exxon Valdez case did not result in widespread animosity towards Exxon or Exxon Mobil where the consuming public just stopped buying their gas. I mean it was a terrible event that happened, caused widespread damage particularly up where it occurred. But that's why this claim is so different because this claim was the consuming public being so angry at BP because of what BP said and did after the fact. Granted, BP did other things where they tried to mitigate their damages, where they tried to correct their public relations. But when you start out by saying oh it's just a little trickle in a big pond and then well maybe it was slightly more than a little trickle, then yeah it was probably more than a little trickle and then all of a sudden there's a discovery that it was humongous, that's when the consuming public says you've been lying to us. We're mad at you for lying to us. We're not going to do business with liars. We're not going to do business with somebody who has absolutely no relationship, and I see I'm in my last couple of moments, relationship. We're just not going to do it. So that's really the nature of our claim and that's why I'm really saying we shouldn't be dealing with this claim based upon the pleadings that we filed really very early on in the case. We should have been given at least one opportunity to amend our complaint so that we could raise the claims properly, so that when you're asked to decide the claims you're actually looking at the true claims that my clients wish to assert. Can I reserve some time? Thank you, Counsel. Thank you, Your Honor. Thank you, Your Honor, and may it please the Court, George Hicks for the BP entities. Plaintiffs filed a garden variety negligence action against BP seeking damages for economic loss caused by the Deepwater Horizon explosion and oil spill. Their complaint repeatedly alleges that as a result of BP's negligence in causing the spill and failing to take effective steps to mitigate the spill, plaintiffs suffered a loss of revenue because of supposed consumer animosity against BP. Under the Supreme Court's Grubart decision, plaintiff's complaint clearly triggers maritime jurisdiction and the application of substantive maritime law. And under substantive maritime law, the well-established Robins Dry Dock Rule precludes recovery of economic damages absent physical injury to a plaintiff's proprietary interest. Plaintiffs here seek only economic damages, and they do not allege any physical injury to a proprietary interest. Therefore, they are barred from any recovery, and their complaint was properly dismissed. Now, plaintiffs don't dispute that if maritime jurisdiction applies, then their complaint was properly dismissed. Instead, in an effort to avoid the straightforward application of well-established law, plaintiffs reconceptualize their complaint into an entirely different complaint than the one they actually pled. First, plaintiffs maintain that they have alleged claims for contract, franchise, and trademark violations. But in fact, the complaint alleges a single tort claim for negligence and does not even include the words contract, franchise, or trademark. Second, plaintiffs insist that their injuries stem from post-spill land-based conduct. But in fact, their complaint repeatedly alleges that plaintiffs' injuries were caused by or were the result of the Deepwater Horizon incident, thereby triggering maritime jurisdiction. Plaintiffs' remaining argument is that they should be allowed to amend their complaint. This argument fails for numerous reasons, including lack of notice, undue delay, prejudice, and futility. In the nearly seven years that this case was pending in the district court, plaintiffs never moved to amend their complaint, never submitted a proposed amended complaint, and never identified what the particularity this court requires, what facts or claims an amended complaint would contain, despite the admitted availability since May 2010 of the information they now argue would be in a new complaint. Before this court, plaintiffs do finally identify two proposed new causes of action, but that is far too late in the game, and it would prejudice defendants to allow plaintiffs to replead nearly eight years after their original complaint. In any event, amendment is futile for two independent reasons. First, the facts and claims that plaintiffs now propose are still intertwined with the Deepwater Horizon incident, thereby triggering maritime jurisdiction and the Robins rule. But second, even absent maritime jurisdiction, the two new claims they allege fail under Georgia state law. Their new negligence claim fails because of Georgia's economic loss rule, and their new claim for breach of the covenant of good faith and fair dealing fails because, under Georgia law, the covenant does not provide an independent basis for liability. The district court correctly dismissed plaintiff's complaint and correctly denied plaintiff's request to amend, and its decision should be affirmed. Now I'd like to turn a little bit to plaintiff's original complaint, which I did not hear my friend on the other side talk too much about, and I think there's a reason for that. The original complaint that they filed in December 2010 repeatedly alleges garden variety, unintentional tort claims, and economic loss resulting from BP's and other defendants' negligence in causing the spill and not mitigating the effects of that spill. And they repeatedly allege negligence, gross negligence, and willful, wanton, and careless disregard. There's absolutely nothing in that complaint, pleaded in December 2010, that has anything to do with contract franchise trademark claims. In addition, while plaintiffs now are claiming that their original complaint is related entirely to post-spill land-based conduct, again, that's just completely refuted by the language of their original complaints from beginning to end. And I'll quote from Paragraph 1. This is a class action to recover damages suffered by plaintiffs as a result of the oil spill that resulted from the explosion and fire aboard the oil rig Deepwater Horizon. Moving all the way to the end, Paragraph 48. The oil spill and the contamination therefrom have caused and will continue to cause a direct and proximate loss of revenue and or loss of earning capacity to plaintiffs. So I think it is very clear that their complaint, as originally pled, clearly triggers maritime jurisdiction. Now, they say in their brief that they, there's a particular paragraph, I think it's Paragraph 38, that they try to use to claim has something to do with deceptive conduct by BP officials after the spill. In fact, all Paragraph 38 says is BP has acknowledged its status as the party responsible for the oil spill in various public media and through various company officials, including testimony before the Senate. There's nothing deceptive about that. It's a true statement. There's simply nothing in the original complaint, pleaded in December 2010, that takes this in any way out of maritime jurisdiction. And regardless, even the one negligence claim that they did plead would fail under Georgia state law anyway because under what was the reason or reasons Judge Barbier gave for refusing to allow them to file an amended complaint? Yes, Judge Winger, I believe the district court gave two reasons. First of all, he noted that they had not filed any sort of amended complaint or made any effort. In fact, plaintiffs, the sum total of plaintiffs' effort to amend their complaint this entire period was a single, very vague footnote in their opposition to the motion to dismiss where all they said was, plaintiffs seek leave to amend to more accurately set forth their claims. This memorandum will discuss the facts which such an amended complaint would allege. But the memorandum never did get into any facts that it would allege, much less any claims. Second, Judge Barbier held that any amendment within this complaint would be futile because it would trigger maritime jurisdiction. And I think that is correct not only because anything that they would plead would be intertwined with maritime jurisdiction, but I think you can also even go beyond maritime jurisdiction and, again, look at Georgia state law. So finally, before this court, now they never did before the district court, and that gets to lack of notice, and I think there are a number of other reasons, lack of notice, undue delay, et cetera, why you would find that there could be no amendment. But going to futility, besides maritime jurisdiction, even if you found that there was no maritime jurisdiction, so they finally pleaded two claims before this court that they say that they would plead if they went back down. Well, the first is just another unintentional tort claim for negligence, and that fails under Georgia's economic loss rule, and that's the General Electric case, 608 Southeast 2nd at 637. And it's really just the exact same thing as the Robins dry dock rule. The second claim that they now say that they would make is a claim for the breach of the covenant of good faith and fair dealing. A couple points about that. Number one, this was definitely never raised below. In fact, at the oral argument on the motion to dismiss, plaintiffs expressly disclaimed any contract claims in this litigation. So this is at pages 54, 55 of the transcript of that oral argument. The district court asks, quote, your clients are not alleging any type of contract claim in this litigation. Right? Answer, pure negligence, Your Honor. So, you know, it's already been waived. But even on the futility question, so Georgia law also says, and this is at the HESI brief at 22, the covenant, quote, the covenant cannot be breached apart from the contract provisions that it modifies and therefore cannot provide an independent basis for liability. That's from U.S. Bank v. Phillips, 734 Southeast 2nd, 799 from 2012. But there are a number of other cases from Georgia holding exactly the same. Plaintiffs here don't actually propose a claim for breach of contract, despite having talked a whole lot about how this is all about contract. Instead, they're simply arguing that there is a breach of the covenant of good faith and fair dealing. But under Georgia state law, that claim does not go anywhere because there's no independent basis for liability. So, again, I think on the futility issue, there are multiple ways that you can find that these claims are futile. But I do also want to talk about the other independent basis, even before you get to futility, why amendments would not be proper here. And I think the first is lack of notice. So this court has said that while you don't actually have to formally move for an amended complaint, the plaintiff still must, quote, set forth with particularity the grounds for the amendment and the relief sought. And I think the best case that shows why amendments can be rejected simply for lack of notice is this court's decision, McKinney v. Irving Independent School District. This is at 309 Fed Third 308, where the court rejected an attempt to amend, saying plaintiffs, quote, failed to amend their complaint as a matter of right, failed to furnish the district court with a proposed amended complaint, and failed to alert both the court and the defendants to the substance of their proposed amendment, end quote. All three of those happened here. Plaintiffs failed to amend their complaint as a matter of right, failed to furnish the district court with a proposed amended complaint, and failed to alert both the court and the defendants of the substance of their proposed amendment. Moving beyond lack of notice, I think you can also reject amendment based on undue delay. As my friend on the other side just said, as early as May 2010, they had these supposedly deceptive statements or animosity-causing statements that caused injury. Well, plaintiffs filed their original complaint in December 2010. So they were certainly in possession of this information at that time, and in the nearly two years between their original complaint in December 2010 and their footnoted request to amend in their opposition to the motion to dismiss in October 2012, again, that's nearly two years, they never made any attempts to amend or to try to include that information, even though, as my friend just admitted, it was available as early as May 2010. And then, for the almost four years after the district court rejected their claims, the plaintiffs did nothing until they finally moved to voluntarily seek final judgment. So there's this sort of inexplicable seven-year-plus delay that they could have brought the claims that they are sort of now kind of claiming that they would bring. And I think that, you know, in fact, Judge Weiner, you wrote an opinion in Ray Southmark from 1996. This is at 88 Fed Third 311. The court rejected an attempted amendment after one year where the facts were known when the complaint was filed. I think that, you know, we are well beyond that at this point in this case. There's one aspect of the undue delay that I want to talk about because it came up in the plaintiff's reply brief. It sort of suggested, it wasn't concrete, but I do want to address it, this idea that plaintiffs were somehow prohibited from amending their complaint or weren't given an opportunity to do so, possibly because of, I think they point to PTO 25, which imposed a stay on complaints that have been filed or would be filed. Three points I want to make about this, just in case it comes up during rebuttal. The first is that there is absolutely nothing in PTO 25 or its stay of complaints that prohibited a plaintiff from amending its complaint. All PTO 25 says is, quote, All individual complaints that fall within pleading bundle B1, whether preexisting or filed hereafter, are stayed until further order of the court. There's nothing in there that prohibits anyone from amending their complaint. Second point, many, many, many plaintiffs did amend their complaints during the PTO 25 stay period. I'll give you just a couple examples, docket number 11-781, docket number 13-709. In these cases, the plaintiffs added causes of action. They added defendants. These are in the B1 pleading bundle also, and the court granted it, often within a matter of days. So the court never had a problem with it. And in fact, third point, when the plaintiffs did finally request sort of to amend their complaint in footnote 6 of their opposition to their motion to dismiss, the district court didn't say, Hey, you can't do that because PTO 25 is in place and there's a stay. No, it simply addressed it and it rejected it without referring it to PTO 25. So I think any suggestion that PTO 25 or any stay of these complaints in any way prohibited the plaintiffs from amending their complaint at any point is just simply not supported. The very last thing I do want to point out is that, you know, to the extent that there could possibly be some sort of complaint out there that is so far removed from the Deepwater Horizon spill, which is not their original complaint and is not even what they now propose they would say, I think that runs into a couple problems as well. The first is that, you know, at that point, you've got a fundamentally different case than was in the original complaint. And again, I'll go back to an opinion that Judge Wiener authored, Mayo v. Louisiana Health Services and Indemnity 376 Fed 3rd 420, where he said where an amendment would, quote, fundamentally alter the nature of the case, it, quote, unduly prejudices defendants. So I think we have a situation here where even if you could somehow sort of conceptualize a complaint that is so far removed from the Deepwater Horizon incident that maritime jurisdiction isn't triggered, and we don't have that here in this case, to be clear, I think it would be so, you know, it would fundamentally alter the nature of the case and be very prejudicial to the defendants. And I think the second problem you would have with that is that at that point, I think plaintiffs have a real relation back problem. Because under Federal Rule 15, an amended complaint only relates back for statute of limitations purposes if it, quote, arises out of the conduct, transaction, or occurrence set out in the original pleading. Well, if you're at a point where you're so far removed from the Deepwater Horizon incident that you've somehow escaped the world of maritime jurisdiction, I don't really see how you can relate back because at this point you've pretty much gone well beyond the conduct, transaction, or occurrence set out in the original pleading. So I think there are simply many, many ways on which this complaint here can't be amended, whether it's lack of notice, undue delay, prejudice, futility, futility itself on maritime jurisdiction grounds or Georgia state law grounds. And I think that the district court was correct in both dismissing the original complaint and denying leave to amend. With no further questions, I do want to cede some time to my co-counsel for Hesse. Thank you. Good morning, Your Honors. May it please the court. My name is Alan York. I'm representing Halliburton Energy Services, Inc., also a defendant in the case below. While I do not speak officially for the Transocean entities, Mr. Miller is here and Transocean joined in Hesse's brief before the court. Our arguments are essentially the same. Before the court this morning, the Tobitax plaintiffs have argued two things, that they have a claim based in tort and a claim based in contract. But within the context of that argument this court has heard, there have been no allegations made against Halliburton or against Transocean. The focus of these arguments are on BP. And, in fact, if the court looks back to the original complaint filed by the Tobitax plaintiffs, the only causal touch with the Halliburton defendant in this case and with Transocean relies specifically upon their actions related to the Deepwater Horizon incident. So restricting the court to the view of what was actually the touch with the Halliburton defendant and with the Transocean defendants, the analysis that this court has reviewed from Judge Barbier time and time again and appeals from this case is just as good today as it ever was, and that is maritime law applies to these claims as to Halliburton and Transocean. Because maritime law applies and because Tobitax plaintiffs have acknowledged that they are seeking only purely economic damages, those damages are not recoverable against Halliburton and Transocean as a result of the Robbins-Drydock doctrine. Now, in addition to that, we heard the Tobitax defendants argue significantly about the contractual claims that they have resulting from the franchise contract with BP. As we pointed out in the brief, there's no allegation that either Halliburton or Transocean was a party to that contract. There is no contract-based claim against these defendants. And the last point that I would make, Judge Wiener, is in response to your question about why Judge Barbier determined that any amendment of this case would be futile. Counsel for BP definitely addressed the vast majority of those arguments. However, I wanted to point out that one of the other things that Judge Barbier did say was that even if an amendment were allowed, he would be unable and would not purposely ignore widely known and easily ascertainable information about the worst oil spill in history. And it's important to note that in their briefing, the Tobitax defendants have tried to segregate their claim out and say that it's somehow different from the claims that were pending before Judge Barbier as a result of these claims that something was done wrong in terms of the response to the spill. The fact of the matter is that was phase two of this litigation. Those issues were tried to Judge Barbier, they were addressed, and they served no basis for liability. Rebuttal. Briefly. In answer to your question, there was only one ground on which Judge Barbier's order precluded amendment, and that was futility. Undue delay is not in there. Secondly, at the outset of our brief, we talked about the fact that our case was stayed, actually pursuant to a stay order that was issued by Judge Barbier before we even filed the case and then by subsequent orders. We had no opportunity. We were not – stay means stay. It means don't be coming into my court and talking to me. So the only time that stay as to our complaint was lifted, and it was lifted a little bit, was to allow the defendants to file motions to dismiss. No discovery, no ability to amend. And remember, the normal rule, when you're granting a 12B motion at the outset on the first complaint, normal practice is you give the plaintiff an opportunity to amend and see if he can correct the deficiencies. That's why we're premature here for this argument. We should have been allowed our opportunity to amend. There is the argument of saying futility based upon Georgia law. There was no finding based upon Georgia law. Plus, Georgia law does not preclude the claims herein because our claims are property related. The BP dealers have a property interest in their franchise agreements and in their right to use, their license to use the BP name and logo, and that's what we have consistently said has been damaged in connection with this. So you heard the argument of saying, from BP counsel, saying the facts are so intertwined, but you didn't hear any specifics. I think I tried to, I believe in response to your question, Judge Ho, explain to you why our claim differs and why we are only focusing on the conduct and the knowledge which arose after the explosion. That's what, there is a difference in nature of the claims that were done before. So I want to thank you again for giving me the opportunity to speak. I see that. We will take these matters.